***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Chapman and the briefs and arguments of the parties. The appealing parties have not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, and having reviewed the competent evidence of record, the Full Commission adopts the Amended Opinion and Award of Deputy Commissioner Chapman in part and modifies it as to the interest owed on medical expenses.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as: *Page 2 
 STIPULATIONS
1. All parties are properly before the Industrial Commission, are subject to and bound by the provisions of the Workers' Compensation Act, the Commission has jurisdiction over the parties and of the subject matter, and an employer-employee relationship existed between plaintiff and defendant-employer at the time of plaintiff's injury.
2. Defendant-employer Libbey-Owens Ford was self-insured at all relevant times. Hartford Specialty Risk Services, Inc. was the third-party administrator at all relevant times.
In addition, the parties stipulated into evidence the following:
 a. Record on appeal to the Court of Appeals.
 b. Plaintiff's brief.
 c. Defendants' brief.
 d. Judgment by the Court of Appeals.
 e. Petition for Discretionary Review to the Supreme Court.
 f. Order by the Court of Appeals filed October 14, 2004.
 g. Order by the Supreme Court filed October 11, 2004.
 h. Packet of medical records and reports.
 i. Plaintiff's motion dated March 23, 2005 with attachments.
 j. Request for extension by defendants dated March 24, 2005.
 k. Plaintiff's response to defendants' request dated March 25, 2005.
 l. Defendants' response dated April 15, 2005.
 m. Plaintiff's response to defendants' response dated April 18, 2005.
 n. Packet of medical bills, travel statements and check stubs for payments.
 o. First page of a letter to Ms. Chapman dated January 19, 2006. *Page 3 
 p. Correspondence from Mr. Pender to Ms. Chapman with attachments.
 q. Correspondence between Scotland Memorial Hospital and Mr. Pender.
 r. Correspondence between Mr. Pender and Ms. Chapman.
 s. Copies of checks from Specialty Risk Services.
 t. Computer printout of payments to Scotland Memorial Hospital.
 u. Additional documents submitted August 25, 2006.
The Pre-Trial Agreement dated April 4, 2006, which was submitted by the parties, is incorporated by reference.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. As previously determined by the March 23, 2003 decision of the Full Commission, plaintiff was forty-seven years old on December 15, 1997 and he had been employed by defendant-employer for twenty-four years. He worked as a shipping technician, a position he had taken in lieu of accepting a buy-out package offered by the company due to downsizing at the plant. He sustained a compensable injury by accident that day when his feet became tangled in a shipping band, causing him to fall to the floor and to injure his low back.
2. Following the injury, plaintiff received treatment by Dr. Williams and by the Occupational Health Services department at the local hospital. Defendants paid for that medical treatment. Although he missed several weeks of work immediately after the fall, the company paid him his regular salary during the period he was out and defendants did not file a Form 60 or other document admitting liability under the Workers' Compensation Act for the injury. *Page 4 
3. Plaintiff subsequently came under the care of Dr. Holzknecht, an orthopedic surgeon, who treated him until November 24, 1998. In the meantime, defendant-employer terminated plaintiff's employment and did not pay compensation to him for the time he was out of work. Defendants did not provide him with further medical treatment after November 1998 but did authorize an evaluation by Dr. Holzknecht on May 11, 2000. Due to the findings on examination that day, Dr. Holzknecht recommended a urological evaluation and an evaluation by a spine surgeon. Defendants subsequently scheduled an appointment with Dr. Edwards, an orthopedic surgeon in Florence, South Carolina, for a one-time evaluation, but plaintiff did not attend the appointment. Prior to that time, defendants had submitted a Form 61 in which they denied that his current condition was related to the injury at work, plaintiff had requested a hearing, and defendants had responded to the hearing request by denying that plaintiff was entitled to further benefits. No further medical treatment was authorized by defendants, only the two medical evaluations, and there was no evidence indicating that defendants obtained an order from the Industrial Commission directing that plaintiff attend an appointment with Dr. Edwards.
4. Prior to the appointment scheduled with Dr. Edwards, plaintiff's counsel had plaintiff examined by Dr. Craig Derian, an orthopedic spine surgeon, on May 18, 2000. Dr. Derian reviewed the MRI performed in 1998 and noted that plaintiff had a primary disruption of the endplate of the L5 vertebra and that the intervertebral disc had herniated into the body of the vertebra (a Schmorl's node.) This condition could result in severe long-term back symptoms. Dr. Derian ordered a current MRI, which revealed degenerative disc disease at L4-5 along with the Schmorl's Node. Although Dr. Derian thought that plaintiff might benefit from fusion surgery, he would not perform it at that time because plaintiff had been abusing alcohol at least *Page 5 
in part as a form of pain relief. There was also evidence of osteopenia in plaintiff's spine which could affect how well the instrumentation inserted during surgery would stay in place.
5. During the following months, plaintiff reduced his alcohol intake and in October 2000 he was reporting that he was able to stop drinking. He returned to Dr. Derian on November 20, 2000 with persistent symptoms. Dr. Derian ordered bone density testing and referred him to Dr. Thomas Giduz, a psychiatrist, for evaluation regarding probable depression.
6. Defendants sent plaintiff for an independent medical examination to Dr. Neville, who was of the opinion that plaintiff would not benefit from fusion surgery. Dr. Neville also noted that plaintiff had osteoporosis, which was an unusual finding considering his age and gender, and that he had psychosocial and substance abuse issues which had not been adequately addressed and which could be affecting his complaints.
7. Dr. Giduz began treating plaintiff on January 30, 2001 for major depression manifested as depressed mood, poor sleep, decreased interest in his usual activities, feelings of guilt, poor energy and poor concentration. Dr. Giduz went through several different antidepressant medications but plaintiff claimed that either the side effects of the medicine were intolerable or that the medicine did not help him. As of the date of his deposition, Dr. Giduz had not found a suitable antidepressant for plaintiff.
8. Plaintiff did not have a treating physician for his back condition at the time Dr. Giduz first evaluated him and therefore had no one else to provide medical treatment for his chronic pain. Since it was the chronic pain which was causing plaintiff's depression, Dr. Giduz also began prescribing medication for plaintiff's chronic pain.
9. Dr. Allen, a neurologist, performed a one-time evaluation of plaintiff on January 15, 2001 but did not note a specific neurological problem. In February 2001 plaintiff was *Page 6 
evaluated by a urologist, Dr. Andrews, for his complaints of inguinal and testicular pain. No genitourinary abnormality was identified.
10. Defendants then had plaintiff evaluated by Dr. Rollins, another psychiatrist, on May 31, 2001, and Dr. Rollins also diagnosed him with a major depressive disorder which required treatment. Dr. Rollins was of the opinion that there were psychological factors involved in his pain disorder.
11. In June 2001 plaintiff was seen by Dr. George Brothers, a rheumatologist, who was deposed after the first hearing in this case. Dr. Brothers saw him because of Dr. Derian's concern regarding possible osteoporosis in the spine. Consequently, laboratory testing and a bone density test were ordered. The laboratory testing revealed that plaintiff had low testosterone, a known risk factor for osteoporosis. A bone density test demonstrated osteopenia in the lumbar spine and osteoporosis in the hips. Plaintiff was encouraged to start a regular weight-bearing program in order to improve his bone health. Consequently, at the follow-up visit, Dr. Brothers not only prescribed a testosterone patch and Fosamax, he also advised plaintiff to exercise. Plaintiff did not follow up with Dr. Brothers.
12. Despite the instructions from Dr. Brothers, plaintiff increasingly limited his activities. Dr. Giduz expressed concern as to how exercise might affect plaintiff's pain level. Dr. Giduz continued to treat him with narcotic medication despite the fact that he had a history of substance abuse and the medication was addictive. However, in 2002, Dr. Giduz recommended plaintiff be re-evaluated by Dr. Derian regarding plaintiff's reports of episodes of his legs going numb and giving way, causing him to fall.
13. Dr. Derian re-examined plaintiff on November 25, 2002 and ordered another MRI, but defendants would not authorize the test. At that time a decision had been filed by *Page 7 
Deputy Commissioner Stephenson but defendants had appealed and the case was pending before the Full Commission. After the Full Commission opinion and award was filed on March 24, 2003, defendants appealed to the Court of Appeals. The Court of Appeals affirmed the Full Commission on May 18, 2004. Defendants filed a petition of discretionary review with the Supreme Court on June 22, 2004. In the meantime, defendants authorized treatment for plaintiff with Dr. Giduz in April 2004 while the matter was pending with the Court of Appeals.
14. The Order by the Supreme Court denying discretionary review was filed October 6, 2004. On October 28, 2004, defendants paid plaintiff temporary total disability benefits from 1998 in accordance with the Opinion and Award. Defendants also reimbursed plaintiff for his out-of-pocket expenses, including his co-payments for medical treatment and prescription drugs and mileage reimbursement.
15. In December 2004 Dr. Giduz recommended that plaintiff return to Dr. Derian for evaluation. However an appointment with the orthopedic surgeon was not scheduled until June 2005, after Bettylou DeMarco, an Industrial Commission nurse, became involved in the case. In the meantime, Dr. Giduz had prescribed a lift-chair, a walker, an electric scooter and a ramp to get the scooter in and out of the house because plaintiff reported increasing pain, weakness and falling episodes.
16. Plaintiff returned to Dr. Derian on July 28, 2005 after having had another MRI. He was using a cane to walk at that time. Dr. Derian reviewed the MRI, examined plaintiff and listened to him and his wife describe how the symptoms had taken away the activities he had previously enjoyed. The doctor concluded that plaintiff would probably not improve without surgery to fuse the lower segments of his lumbar spine. However, he cautioned plaintiff that he *Page 8 
was at an increased risk for having the instrumentation pull out due to osteoporosis, which the doctor thought was most likely related to plaintiff's history of alcohol abuse.
17. Plaintiff was quite anxious about the prospect of having surgery, so Dr. Giduz recommended that he get a second opinion. Consequently, Dr. William Lestini, another orthopedic spine surgeon, evaluated him on November 10, 2005 and reviewed his medical records. Dr. Lestini did not believe that the MRI showed a definite cause for the reported symptoms, since there was no truly significant finding. In his opinion, plaintiff would have to undergo a discogram in order to determine which, if any, of the levels in his lumbar spine were symptomatic. Without a discogram, it was Dr. Lestini's opinion that plaintiff had reached maximum medical improvement but would require ongoing conservative treatment, which would involve his being weaned off of narcotic medication, as well as having permanent light duty work restrictions.
18. Defendants then sent plaintiff to Dr. Scott Sanitate, who evaluated him on December 19, 2005. Dr. Sanitate's impressions were that plaintiff had chronic low back pain with multiple other psychosocial stressors, that he was taking frequent high doses of long-acting narcotics with questionable benefit and that he had failed treatment with multiple antidepressants. Dr. Sanitate recommended plaintiff's medications be consolidated, that he ambulate independently, without a scooter, except for long distances and that he start physical therapy or aqua therapy.
19. The only treatment plaintiff received for his back-related symptoms after the evaluation with Dr. Sanitate was from Dr. Giduz. He did not want to undergo a discogram, since it could be a painful procedure and he was not ready to undergo surgery. However, he did have another bone density test, which indicated that the bone loss in his lumbar spine had progressed *Page 9 
from osteopenia to osteoporosis. In addition, his attorney and Dr. Giduz sent him to Dr. Steven Prakken, a psychiatrist and pain management doctor, for evaluation after the hearing in April 2006. Dr. Prakken's opinions were inconsistent with those of the orthopedic surgeons who were more knowledgeable about the musculoskeletal and nervous systems relative to the spine. To the extent that his diagnoses and opinions differed from those of the orthopedic surgeons, they have been given less weight.
20. Dr. Derian reviewed the latest bone scan results during his deposition. Considering the worsening of the osteoporosis, plaintiff's psychiatric state and the length of time that plaintiff had been symptomatic, Dr. Derian decided that he would no longer recommend surgery. Since surgery was no longer a good option, it was the doctor's opinion that plaintiff needed a team approach with respect to future treatment, that he needed to be on non-narcotic medication and that he needed to exercise and recondition himself. Dr. Derian, who regularly treated patients with true paralysis, was of the opinion that the give-way episodes plaintiff was experiencing were due largely to psychological issues, since his objective findings did not reveal a neurological problem. Dr. Lestini testified similarly. Plaintiff had a normal neurological examination and did not have findings on his MRI which would explain the give-way episodes, the testicular pain or any problems associated with loss of bowel control.
21. Although Dr. Lestini recommended plaintiff undergo a discogram to determine which, if any, of the levels in his lumbar spine were symptomatic prior to recommending surgery, Dr. Derian, plaintiff's treating physician, no longer recommends plaintiff undergo surgery due to his worsening osteoporosis.
22. Despite recommendations from multiple doctors, including Dr. Sanitate to whom defendants referred plaintiff, that plaintiff should have a comprehensive team of doctors address *Page 10 
his complaints, defendants failed to provide the treatment that plaintiff required in order to manage his ongoing symptoms. Although Dr. Giduz could treat his psychiatric problems, plaintiff needed another doctor more knowledgeable about the musculoskeletal system to be involved with pain management. Dr. Giduz allowed plaintiff to increasingly limit his activity level due to complaints of pain despite the fact that the orthopedic surgeons and the rheumatologist who evaluated plaintiff emphasized that that he needed to be as active as possible in order to avoid further deterioration of his physical condition. Furthermore, in their opinion, plaintiff's degenerative disc disease would be expected to be a long-term problem and his only hope for improvement would be with reconditioning himself. Otherwise, the condition would be expected to worsen as he got older. There was also the issue of the high doses of narcotic medication prescribed for a long-term benign condition.
23. It appears that this case should be referred to the Industrial Commission's Nurses Section for a nurse to be assigned to assist the parties in determining the appropriate physicians to evaluate and treat plaintiff for his ongoing symptoms. Dr. Prakken, being another psychiatrist, would not be the appropriate doctor to treat plaintiff even though he is also certified in pain management.
24. Since the hearing before the Deputy Commissioner, defendants have agreed to pay for the scooter, the ramp and modifications to plaintiff's van. However, there were legitimate grounds for them to delay authorization for those items in view of the opposition of the orthopedic surgeons, who were concerned about the effect of inactivity on plaintiff's osteoporosis and degenerative disc disease. The devices were ultimately allowed only for psychiatric purposes so that plaintiff could use them to get out into the community in places which would otherwise involve walking long distances beyond his capability. The Full *Page 11 
Commission finds that defendants did not defend the authorization of the scooter, ramp, and modifications to plaintiff's van without reasonable grounds.
25. At his deposition, Dr. Brothers testified that plaintiff had multiple risk factors for osteoporosis, including a heavy smoking history, a history of excessive alcohol use, low testosterone levels of unknown duration and the sedentary lifestyle after the fall. Dr. Brothers could not state with any medical certainty whether it was plaintiff's compensable 1997 accident, his smoking, his alcohol consumption, or his abnormally low testosterone levels that accelerated or materially aggravated plaintiff's pre-existing osteopenia/osteoprosis.
26. Dr. Derian opined at his deposition that plaintiff had multiple risk factors that contributed to the development of osteoporosis, including alcohol abuse, physical inactivity, low testosterone levels, heavy smoking, and hereditary factors. Dr. Derian opined that all these factors would work together to exacerbate plaintiff's pre-existing osteopenia and its progression to osteoporosis.
27. Although plaintiff's sedentary lifestyle after his injury was a contributing factor, it was not proven by the greater weight of the credible evidence to be a significant or material aggravating factor in the development of plaintiff's osteoporosis. Thus, the Full Commission finds that plaintiff's osteopenia and osteoporosis are not related to the compensable injury.
28. In April 2004, while this matter was pending appeal before the Court of Appeals, defendants paid for the treatment provided by Dr. Giduz from January 30, 2001 through January 13, 2004. Consequently, Dr. Giduz was paid on a timely basis and no late payment penalty would apply.
29. For the period of time that defendants were not authorizing and paying for plaintiff's medical treatment, Scotland Memorial Hospital provided health care coverage to *Page 12 
plaintiff through his wife during the time she was an employee at the hospital. While this case was pending, the hospital paid for the medications prescribed by Dr. Giduz for plaintiff's pain and depression in the amount of $11,990.08. Susan Evans, the hospital benefits coordinator, requested reimbursement from defendants in July 2005. Defendants reimbursed Scotland Memorial Hospital in December 2005. Defendants did not make timely payment. Although they paid part of the ten percent penalty owed, they did not pay the full amount of $1,199.10.
30. The medical bills of Dr. Derian and Durham Regional Hospital, where plaintiff received an MRI upon Dr. Derian's recommendation, were not paid by defendants on a timely basis after a final decision was entered in the case. While defendants initially accepted plaintiff's claim as compensable, defendants ultimately filed a Form 61 and ceased providing medical care to plaintiff. Pursuant to the previous Full Commission Opinion and Award, which was affirmed by the Court of Appeals, defendants were ordered to pay all medical expenses incurred by plaintiff as a result of his compensable injury. While defendants assert that treatment with Dr. Derian did not affect a cure, give relief or lessen plaintiff's period of disability, defendants were ordered by Special Deputy Commissioner Harris on April 22, 2005 to promptly pay for Dr. Derian's medical treatment. Dr. Derian did not receive payment from defendants until August or September 2005.
31. The urological examination performed by Dr. Andrews and the treatment for plaintiff's osteoporosis were not conditions caused by or materially aggravated by the injury giving rise to this claim. Defendants are not liable for payment for that treatment except insofar as Dr. Derian ordered such evaluations in order to determine whether plaintiff was a surgical candidate. *Page 13 
32. After the North Carolina Supreme Court denied defendant's Petition for Discretionary Review, which was witnessed and sealed on October 11, 2004, defendants issued a check to plaintiff on October 26, 2004 for $169,301.57. This check represented plaintiff's weekly temporary total disability benefits from March 23, 1998 through October 29, 2004. Defendants then issued and mailed a check for $19,356.92 on October 28, 2004, constituting a portion of the interest payable on the indemnity benefits. A third check for $18,458.32, constituting the remaining interest owed was issued and mailed on November 4, 2004.
33. Defendants have not paid interest to plaintiff on plaintiff's out-of-pocket expenses, including his co-payments for medical treatment and prescription drugs and mileage reimbursement.
34. Defendants have also not paid interest to plaintiff on the medical expenses paid by plaintiff's third-party health insurance plan.
35. Plaintiff has remained unable to work in any capacity due to the injury by accident giving rise to this claim.
36. There were issues raised in the case where there were legitimate defenses, and, in fact, defendants prevailed on some of those issues. Defendants are not found to have defended the case as a whole without reasonable grounds.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Defendants shall continue to pay compensation to plaintiff for total disability until he returns to work or until further order of the Industrial Commission. N.C. Gen. Stat. § 97-29. *Page 14 
2. Plaintiff is not entitled to a 10% late payment penalty under N.C. Gen. Stat. § 97-18(i) for defendants' initial refusal and subsequent reimbursement of the scooter, ramp, and van modifications. Because defendants did not approve the items, defendants did not authorize payment of said items and thus defendants did not make untimely payment of the bills submitted for the scooter, ramp, and van modifications. N.C. Gen. Stat. § 97-18(i). Plaintiff is not entitled to attorney's fees as defendants had reasonable grounds for initially refusing the authorization of the scooter, ramp, and modifications to plaintiff's van. N.C. Gen. Stat. § 97-88.1
3. When an Opinion and Award by the Full Commission is appealed to the Court of Appeals, the appeal operates to stay the effect of the Opinion and Award and no employer shall be required to make payment of the award involved in said appeal. N.C. Gen. Stat. § 97-86. In its Opinion and Award filed on March 23, 2003, the Full Commission ordered defendants to pay for all medical expenses incurred by plaintiff as a result of his compensable injury, including treatment for plaintiff's depression. Defendants paid for plaintiff's treatment with Dr. Giduz while the matter was on appeal to the Court of Appeals even though the appeal acted as a stay of the Full Commission's March 23, 2003 Opinion and Award. As such, Dr. Giduz was paid in a timely manner and Dr. Giduz is not entitled to an award of a late payment penalty. N.C. Gen. State. §§ 97-86, 97-18(i).
4. The issue raised by defendants as to whether plaintiff should undergo the discogram requested by Dr. Lestini has been rendered moot by Dr. Derian's determination that surgery would not be advisable at this time.
5. The right to control medical care requires that the employer admit liability for benefits under the Workers' Compensation Act. Since defendants denied liability for this claim by filing a Form 61 indicating the plaintiff's current condition was not related to the *Page 15 
compensable injury and by ceasing to authorize further medical treatment, plaintiff was entitled to go to Dr. Derian, who then became his treating physician. Defendants became liable for the medical expenses associated with Dr. Derian's treatment pursuant to the prior decisions filed in the case but did not pay those expenses on a timely basis. Consequently, Dr. Derian and any medical providers who performed testing necessary for the doctor to determine if plaintiff was a surgical candidate are entitled to have an additional ten percent penalty assessed against defendants for late payment if the bills were not paid within sixty days of receipt. N.C. Gen. Stat. §§ 97-2 (19);97-25; 97-18(i); Bailey v. Western Staff Services, 151 N.C. App. 356
(2002). This would include any test or evaluation conducted by another physician pursuant to a referral by Dr. Derian. Dr. Giduz is plaintiff's authorized treating physician, a fact which defendants were aware of and conceded to by authorizing and paying for treatment Dr. Giduz provided to plaintiff in April 2004. Dr. Giduz referred plaintiff to Dr. Lestini in November 2005. As such defendants shall pay for the evaluation conducted by Dr. Lestini and a 10% penalty for its failure to pay for the evaluation in a timely manner. Dr. Giduz also referred plaintiff to Dr. Prakken for an evaluation in 2006. As such, defendants shall pay for the evaluation conducted by Dr. Prakken and a 10% penalty for its failure to pay for the evaluation in a timely manner. However, defendants are not responsible for Dr. Prakken's additional charges for services requested by counsel for plaintiff. Id.
6. Scotland Memorial Hospital is entitled to receive the remainder of the ten percent penalty due for defendants' late payment of prescription drug expenses. N.C. Gen. Stat. § 97-18(i).
7. Under N.C. Gen. Stat. § 97-18(e), compensation becomes due 10 days after the appeal period expires from a judgment entered in a case on appeal. Pursuant to the North *Page 16 
Carolina Rules of Appellate Procedure, Rule 32, an order becomes a judgment 20 days after the Opinion is filed with the Clerk. Under N.C. Gen. Stat. § 97-18(g), if any installment of compensation is not paid within 14 days after it becomes due, a 10% penalty shall be paid on the compensation. Consequently, the interest paid to plaintiff on November 4, 2005 was paid on a timely basis and no late-payment penalty would apply. N.C. Gen. Stat. § 97-18 (e) and (g); Rule 32, North Carolina Rules of Appellate Procedure; Morrison v. Public Service Co. of NorthCarolina, Inc., ___ N.C. App. ___, 643 S.E.2d 58 (2007).
8. Defendants shall pay plaintiff interest on any medical expenses plaintiff paid out-of-pocket, including his co-payments for medical treatment and prescription drugs and mileage reimbursement. Plaintiff is not entitled to interest on medical expenses paid by a third-party health insurance plan. N.C. Gen. Stat. § 97-86.2, Childress v. TrionInc., 125 N.C. app. 588, 481 S.E.2d 697 (1997).
9. Plaintiff is not entitled to have defendants pay for his urological evaluation or the treatment for his osteoporosis in that the conditions involved were not a proximate result of the injury by accident giving rise to this claim. N.C. Gen. Stat. §§ 97-2(19); 97-25; Click v. PilotFreight Carriers, Inc., 300 N.C. 164 (1980).
10. Plaintiff is entitled to have defendants provide all medical compensation arising from this injury, including the treatment by Dr. Derian, except for the urological evaluation and the evaluation and treatment for his osteoporosis except insofar as Dr. Derian ordered such evaluation(s) in order to determine whether plaintiff was a surgical candidate. N.C. Gen. Stat. §§ 97-2(19); 97-25.
11. As recommended by Dr. Derian, plaintiff is entitled to be evaluated by a physician knowledgeable regarding the musculoskeletal system who can formulate a team *Page 17 
approach to his medical treatment, which would include the psychiatric treatment by Dr. Giduz, but which would address the physical aspects of his ongoing symptoms as well as the psychiatric symptoms. Dr. Prakken is not authorized to treat plaintiff and defendants are not required to pay for any treatment provided by Dr. Prakken except as noted in Conclusion of Law 5. N.C. Gen. Stat. §§ 97-2(19); 97-25.
12. Plaintiff is not entitled to have attorney's fees assessed against defendants since there were grounds to support their defense of some of the issues raised in this claim. N.C. Gen. Stat. § 97-88.1. Furthermore, plaintiff is not entitled to attorney's fees for fees incurred due to defendants' appeal of Deputy Commissioner Chapman's Opinion and Award. N.C. Gen. Stat. § 97-88
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enter the following:
 AWARD
1. Defendants shall continue to pay compensation to plaintiff for total disability until he returns to work or until further order of the Industrial Commission, subject to the attorney's fee approved.
2. Defendants shall pay the full ten percent penalties due for late payment of the drug expenses to Scotland Memorial Hospital and the medical bills from Dr. Derian and any provider who, upon referral by Dr. Derian, performed testing required to determine whether plaintiff was a surgical candidate if those bills were not paid within 60 days of their submission to defendants. *Page 18 
3. Defendants shall pay plaintiff interest on any medical expenses plaintiff paid out-of-pocket, including his co-payments for medical treatment and prescription drugs and mileage reimbursement.
4. Defendants shall pay all medical expenses incurred by plaintiff as a result of this injury by accident, but excluding those arising from the urological evaluation as well as treatment or evaluations for osteoporosis to the extent that they were not required by Dr. Derian in order to determine whether plaintiff was a surgical candidate.
5. An attorney's fee in the amount of twenty-five percent of the ongoing compensation is approved for plaintiff's counsel. Defendants shall pay plaintiff's counsel every fourth check.
6. Defendants shall pay the costs.
 ORDER REGARDING THE ASSIGNMENT OF AN INDUSTRIAL COMMISSION NURSE
IT IS HEREBY ORDERED this case shall be referred to the Industrial Commission's Nurses Section for a nurse to be assigned to assist the parties. Defendants shall provide the medical treatment recommended by Dr. Derian which will involve a team approach including a doctor who is knowledgeable with regard to the musculoskeletal system. The parties are instructed to work together to agree on the doctor or doctors to be consulted in this regard. However, plaintiff's motion that Dr. Prakken be the treating physician is denied since he is not a specialist in musculoskeletal problems.
 ORDERS REGARDING MOTIONS OF ALLEGED VIOLATION OF N.C. RULES OF PROFESSIONAL CONDUCT AND MOTION FOR ATTORNEYS' FEES PURSUANT TO N.C. GEN. STAT. § 97-88. *Page 19 
Defendants filed a Motion for Appropriate Relief alleging violation of Rules 1.12(a) and 1.12(c) of the North Carolina Rules of Professional Conduct on the part of plaintiff's counsels. In particular, defendants allege plaintiff's counsel, Thomas J. Bolch, who signed the motion for attorneys' fees referenced below, participated personally and substantially as a judge in the Full Commission's Opinion and Award of March 24, 2003 and did not obtain written, informed consent from all parties. Defendants further allege that plaintiff's counsel, Heidi G. Chapman, did not screen Mr. Bolch from participation in this matter or provide written notice to the parties. Plaintiff's counsels provided a Response, including an apology for their conduct and assurance that measures have been taken to prevent violation in the future. Upon information and belief, Mr. Bolch no longer practices with Ms. Chapman and thus, no longer represents plaintiff in this matter.
The Full Commission finds that plaintiff's motion for attorneys' fees pursuant to N.C. Gen. Stat. § 97-88 with respect to defendants' present appeal in this matter and also with respect to the prior appeal which resulted in the Full Commission's Opinion and Award of March 24, 2003 and in the decision of the North Carolina Court of Appeals filed on May 18, 2004 was filed in a manner that constitutes a violation of Rules 1.12(a) and 1.12(c) of the North Carolina Rules of Professional Conduct. As such, plaintiff's motion for attorneys' fees is hereby DENIED.
Regarding plaintiff's allegations that defendants' counsel violated Rule 3.3 of the North Carolina Rules of Professional Conduct, the Full Commission finds that defendants did not violate Rule 3.3 of the North Carolina Rules of Professional Conduct.
 ORDER REGARDING PLAINTIFF'S MOTION TO APPROVE CASE EXPENSES
Plaintiff filed a Motion for Approval of Legal Case Expenses (attorneys' fees and costs) through October 30, 2004 for the purposes of determining plaintiff's Social Security Disability *Page 20 
offset. Since the Full Commission has previously approved attorneys' fees in the amount of 25% of temporary total disability payments awarded to plaintiff in its Opinion and Award filed March 24, 2003 and since it is not within the Commission's discretion to award costs, plaintiff's motion is DENIED.
This the 28th day of November, 2007.
 S/______________________
 DIANNE C. SELLERS
 COMMISSIONER
CONCURRING:
 S/______________________ BERNADINE S. BALLANCE COMMISSIONER
 S/______________________ DANNY LEE MCDONALD COMMISSIONER *Page 1